UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 2:25-cr-5-1 |
| ) | |
| IAN QUINLAN, ) | |
| Defendant. ) | |

## ORDER
(Doc. 30)

Defendant Ian Quinlan moves to suppress statements he made to law enforcement on October 30, 2023, at his home, arguing that the statements were obtained in violation of the Fifth Amendment because he was subjected to custodial interrogation without *Miranda* warnings. (Doc. 30 at 1–2.) The Government opposes the motion, asserting that Mr. Quinlan was not in custody when the statements were made and that the statements were voluntary. (Doc. 34 at 1.) The Court must determine whether, under the totality of the circumstances, Mr. Quinlan was in custody under *Miranda* at the time he made the challenged statements.

**Findings of Fact**

Homeland Security Investigations and the Vermont Attorney General's Office, operating through the Vermont Internet Crimes Against Children Task Force, received a tip from the National Center for Missing and Exploited Children regarding child sexual abuse material ("CSAM"). The investigation linked the online activity to a residence located at 122 Elm Street, Unit 3, in Montpelier, Vermont.

In October 2023, Vermont Attorney General's Office Detective Jesse Sawyer obtained a search warrant authorizing a search of the residence located at 122 Elm Street, Unit 3, of Ian Quinlan and Billiejo Quinlan, and of two automobiles. In the early morning hours of October 30,

2023, law enforcement went to 122 Elm Street, Unit 3 to execute the search warrant. There were five or six law enforcement officers participating in the search team. When they arrived, only Detective Sawyer and Detective Sarah Superneau approached the unit. The remaining members of the search team waited nearby, but they stayed out of sight.

Detectives Sawyer and Superneau knocked on the door. Detective Sawyer was dressed in cargo pants, a sweater or shirt, and an external carrier vest. He was not wearing any tactical gear, such as a shield or helmet. Both detectives had a handgun in a holster on their hip.

Mr. Quinlan answered the door and spoke with the detectives on the front porch. Detectives Sawyer and Superneau identified themselves and indicated they were conducting an investigation. Mr. Quinlan asked the detectives if he could get his slippers. He was allowed to do so, and he went back into the house. When he went inside, a female, who was identified as Mr. Quinlan's wife, came outside to the front porch and asked the detectives why they were there. When Mr. Quinlan returned to the front porch, Detective Sawyer reiterated they were police officers conducting an investigation. He told Mr. Quinlan and Ms. Quinlan they were not under arrest, not in custody, and did not have to answer questions. They were not told that they were free to leave, although Detective Sawyer testified they would have been allowed to leave.

The detectives continued to speak with the Quinlans on the front porch. The detectives learned that, in addition to the Quinlans, another individual, identified as Joseph Jones, had been living at the residence for the past two years. The detectives were told that Mr. Jones was at work, not at home.

During the conversation on the front porch, Ms. Quinlan indicated that she was not feeling well and asked to go into the residence. She was allowed to return inside, and Mr. Quinlan remained on the porch and talked with the detectives. A short time later, a man, later identified as

Mr. Jones, came to the door and indicated that Ms. Quinlan had fallen. Mr. Quinlan went inside to assist his wife.

Detectives Sawyer and Superneau spoke with Mr. Jones on the porch for a short period of time, but they soon entered the residence. When the detectives entered the home, everyone was gathered in the living room area, which is located just inside the entryway. At this point, Detective Sawyer told the three individuals the officers had a warrant to search the home and they were searching for items related to the possession of CSAM. Detective Sawyer told the individuals that nobody was under arrest or in custody and they did not need to answer any questions.

In response to this, Ms. Quinlan seemed appalled by the reason for their presence at the residence. Mr. Jones offered his devices to law enforcement for examination. From Detective Sawyer's perspective, Mr. Quinlan did not respond. Because of the difference in reactions from the individuals, Detective Sawyer chose to speak to Mr. Quinlan first. He asked to speak to Mr. Quinlan privately in the kitchen area. Once there, Detective Sawyer let Mr. Quinlan know that Detective Sawyer believed Mr. Quinlan had been accessing and was in possession of CSAM. During this conversation, Mr. Quinlan was allowed to move about the kitchen freely, including getting himself a glass of water.

Mr. Quinlan acknowledged he had struggled throughout his life with accessing and using CSAM. Detective Sawyer asked what devices he used to access the materials. Mr. Quinlan responded that he used portable devices and an Xbox that was located in the upstairs of the residence. Mr. Quinlan offered to show Detective Sawyer the devices he used to access the CSAM, and the two of them went upstairs. Detective Sawyer again advised Mr. Quinlan that he was not under arrest, not in custody, and did not have to answer questions. Detectives Sawyer and Superneau had been in the home for less than one hour when he went upstairs with Mr. Quinlan.

During the time in the kitchen, Detective Sawyer did not stop Mr. Quinlan from making additional statements. In fact, Detective Sawyer's goal was to continue to question him in order to elicit additional information.

Once upstairs, Mr. Quinlan showed Detective Sawyer the location of the devices. Detective Sawyer and Mr. Quinlan continued to discuss Mr. Quinlan's background and his struggles with CSAM. Mr. Quinlan returned downstairs. At this point, Detective Sawyer summoned the members of the search team, and they entered the residence.

Two of the members of the search team were forensic examiners. One of the forensic examiners told Detective Sawyer that the Xbox had been factory reset, deleting its contents, and the reset appeared to have taken place that morning. Detective Sawyer returned downstairs and asked Mr. Quinlan if he had reset the Xbox. Mr. Quinlan acknowledged that he had deleted the contents of the Xbox when he went into the house to get his slippers.

After the search was completed, Detective Sawyer told Mr. Quinlan that he was under arrest. Detective Sawyer allowed Mr. Quinlan to walk outside of the residence to the police car before placing Mr. Quinlan in handcuffs. Mr. Quinlan was then transported to the Montpelier Police Department. Mr. Quinlan was not advised of his *Miranda* rights at any point during his interaction with Detective Sawyer.

**Standard**

"[W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." *Miranda v. Arizona*, 384 U.S. 436, 478 (1966). The Government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id* at 444. Such procedural safeguards "are

4

required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980).

In this context, interrogation refers to any questioning "reasonably likely to elicit an incriminating response." *United States v. Yago*, No. 06-CR-16-1., 2007 WL 1555775, at *3 (D. Vt. May 16, 2007) (citing *Innis*, 446 U.S. at 301). One procedural safeguard includes the recitation of *Miranda* rights before any questioning by law enforcement. *See Berkemer v. McCarty*, 468 U.S. 420, 428–29 (1984); *United States v. Ali*, 68 F.3d 1468, 1472 (2d Cir. 1995) (citing *Miranda*, 384 U.S. at 444). "After such warnings have been given, and such opportunity afforded [the defendant], the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement." *Miranda*, 384 U.S. at 479. "But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against [the defendant]." *Id.*

## Conclusions of Law

Mr. Quinlan asks the court to suppress any statements he made to law enforcement at his residence because he did not receive *Miranda* warnings before the officers interrogated him. (*See* Doc. 30 at 1–2.) The Government opposes the Motion, arguing that Mr. Quinlan's statements were made during consensual, noncustodial questioning and are therefore admissible. (Doc. 34 at 1.)

The Government and Mr. Quinlan agree that the officers' questioning of Mr. Quinlan qualifies as an interrogation under *Miranda* and that no *Miranda* warnings were given. *Id.* at 4. The only question before the court is whether Mr. Quinlan was in custody when officers interrogated him. *See United States v. FNU LNU*, 653 F.3d 144, 148 (2d Cir. 2011) (citing *Cruz v. Miller*, 255 F.3d 77, 80–81 (2d Cir. 2001)) ("An interaction between law enforcement officials

and an individual generally triggers *Miranda*'s prophylactic warnings when the interaction becomes a 'custodial interrogation.' This determination has two parts: (a) there must be an interrogation of the defendant, and (b) it must be while she is in 'custody.'").

Courts in the Second Circuit apply a two-step objective inquiry to determine whether an individual is in custody: (1) "whether a reasonable person would have thought he was free to leave the police encounter at issue," and (2) whether "a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *United States v. Faux*, 828 F.3d 130, 135 (2d Cir. 2016) (citation modified). Although both steps are required, the second step is the "ultimate inquiry" because "not all seizures amount to custody" for purposes of *Miranda*." *Id.* (citation modified).

In assessing whether restraints rose to the "degree associated with formal arrest," courts consider, among other factors: "(1) the interrogation's duration; (2) its location"; "(3) whether the suspect volunteered for the interview; (4) whether the officers used restraints; (5) whether weapons were present and especially whether they were drawn; and (6) whether officers told the suspect he was free to leave or under suspicion." *Id.* (citation modified). Courts also consider whether officers "affirmatively convey the message that the defendant is not free to leave," or that they are "completely at the mercy of the police." *United States v. Familetti*, 878 F.3d 53, 60 (2d Cir. 2017) (citation modified). This is an objective assessment of the circumstances, and the suspect's subjective belief generally is not relevant. *Faux*, 828 F.3d at 135. The subjective belief of the law enforcement official is relevant only if the belief was "somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave." *Stansbury v. California*, 511 U.S. 318, 325 (1994).

Prior decisions on custodial interrogations in this district reflect these principles. In *Wright*, for example, the court found no custody when the defendant agreed to speak with officers, was told he was not under arrest, was not handcuffed or restrained, weapons were not drawn, and the encounter ended without arrest. *See United States v. Wright*, Case No. 2:16–cr–46, 2016 WL 5864783, at *12–13 (D. Vt. Oct. 6, 2016). By contrast, in *Robistow*—a case in which the court did find the defendant was taken into custody—the defendant, who was on a boat, was stopped by a law enforcement vessel with sirens and lights activated, frisked, separated from his spouse, and subjected to "pointed questions" about his prior arrest history under circumstances that would have led an objective person to believe he was the target of an investigation. *See United States v. Robistow*, Case No. 2:24-cr-00113-1, 2025 WL 1397257, at *6–7 (D. Vt. May 14, 2025). Law enforcement officers did not tell Mr. Robistow he was not under arrest. *Id.* at *7.

Considering the totality of the circumstances, *see Tankleff v. Senkowski*, 135 F.3d 235, 245 (2d Cir. 1998), the court concludes Mr. Quinlan was not in custody when he made the statements challenged in his motion. The factors considered by the Second Circuit weigh heavily against a determination of custody:

i. **Location and Atmosphere**

The questioning occurred at Mr. Quinlan's residence—first at the front door/front porch and then inside the home. (Doc. 34 at 2–3.) Detectives knocked on Mr. Quinlan's front door before executing the search warrant, while the search team remained "out of sight." *Id.* at 2. Mr. Quinlan emphasizes that officers "remained with Mr. Quinlan on his front porch while a team of officers searched his house," and argues that "it is conceivable that Mr. Quinlan did not believe he was free to leave." (Doc. 30 at 2.) The fact that the search took place at Mr. Quinlan's home (rather than, for example, in public or at a police station, *see Faux*, 828 F.3d at 135) weighs against

7

this argument, particularly when—unlike *Robistow*—there is no indication of police-compelled isolation or comparable restraint, such as frisking.

### ii. Freedom of Movement

The record indicates Mr. Quinlan and his companions moved freely throughout the house during the search and questioning without constraint from the officers. After the detectives identified themselves and asked to speak, Mr. Quinlan was allowed to go back inside the house, by himself, to get his slippers. During questioning on the porch, Mr. Quinlan's wife asked to go inside and did so without limitation by the detectives. While the detectives spoke with Mr. Jones, Mr. Quinlan returned inside to take care of his wife. Mr. Quinlan was free to move about the kitchen to get water while he was speaking with Detective Sawyer. Mr. Quinlan's movement throughout the residence undermines the argument that a reasonable person would have understood his movements were restricted to a degree comparable to arrest.

### iii. Advisements from Officers

Detectives repeatedly advised Mr. Quinlan and his companions that no one was under arrest, no one was in custody, and they did not have to answer questions if they did not want to. Mr. Quinlan acknowledges these assurances but characterizes them as "self-serving." (Doc. 30 at 2.) The custody inquiry, however, is objective and turns on what was conveyed and how a reasonable person would understand the encounter. *See Faux*, 828 F.3d at 135. Repeated advisements that Mr. Quinlan was not under arrest and need not answer questions weigh against a finding that he was not free to leave or "completely at the mercy of the police." *See Familetti*, 878 F.3d at 60 (citation modified).

### iv. Voluntary Participation In Questioning

After detectives spoke with Mr. Quinlan, his wife, and another resident as a group in the living room and provided a copy of the search warrant, Detective Sawyer asked to speak with Mr. Quinlan in the kitchen. Mr. Quinlan describes this as being "led away from the group for a private interview in the kitchen area." (Doc. 30 at 2.) The record, however, establishes the conversation was consensual rather than compelled. This setting resembles the noncustodial, in-home questioning discussed in *Wright* and *Alexander*, in contrast to the frisking, compelled separation, and targeted detention that supported a finding of custody in *Robistow*.

### v. Restraints and Timing of Arrest

The statements Mr. Quinlan seeks to suppress—those made on the porch, in the living room, in the kitchen, and while walking upstairs to identify devices—were made before any formal arrest or physical restraint. (Doc. 30 at 2–4; Doc. 34 at 2–4.) Only after those statements were made was Mr. Quinlan taken into custody, handcuffed, and brought to the Montpelier Police Department. This factor weighs against a finding of custody.

### vi. Weapons, Show of Force, and Police-Dominated Atmosphere

The materials before the court do not describe drawn weapons, threats, raised voices, or physical intimidation during the questioning. The search team's presence by itself does not convert an in-home interrogation into custody under *Miranda*, particularly when Mr. Quinlan and other occupants moved around the home without interference and detectives repeatedly advised that no one was under arrest and that answering questions was optional. As *Alexander* explains, *Miranda* warnings are designed to protect against compulsion when an individual is "cut off from the outside world and subjected to incommunicado interrogation in a police-dominated atmosphere."

*See* 2018 WL 1891307, at *8 (citation modified).  As in *Alexander*, those circumstances are not present here.

During the hearing on this Motion, Mr. Quinlan argued custody began the moment Mr. Quinlan allegedly made an incriminating statement indicating he possessed CSAM. Mr. Quinlan contended a reasonable person would know that, if police entered the residence to execute a search warrant for CSAM and that person admitted to possessing CSAM, that statement would lead to their arrest before the end of the encounter, and they would therefore no longer be free to leave their residence.  According to Mr. Quinlan, if law enforcement wanted to continue their questioning, they had a constitutional obligation to advise Mr. Quinlan of his *Miranda* rights after he allegedly admitted to possessing CSAM.

Mr. Quinlan's argument, however, is not supported by case law in this circuit. The court is unaware of any case finding custody in the circumstances described by Mr. Quinlan. Mr. Quinlan's argument primarily focuses on the first element of custody—whether a reasonable person would have thought he was free to leave the police encounter at issue—but does not satisfy the second element.  As the Second Circuit described in *Faux*, the second element—whether a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest—is "the ultimate inquiry because a free-to-leave inquiry reveals only whether the person questioned was seized. Not all seizures amount to 'custody'; a seizure is a necessary, but not sufficient, condition." 828 F.3d at 135 (citation modified). The details of Mr. Quinlan's encounter described above, including his free movement around the house both before and after he allegedly made incriminating statements about possessing CSAM, the lack of restraints, the absence of drawn weapons or use of force, and the repeated advisements from officers that he was not under arrest cut against a finding that a reasonable person would have

experienced a limit on their freedom of action resembling arrest. *See id.* at 137 (citation modified) ("The condition imposed on [the defendant's] movements did not amount to custody. She may have been seized, but . . . not every seizure amounts to custody.").

## Conclusion

Even if a reasonable person might have perceived some constraint from the officers' presence and the execution of a search warrant, the totality of circumstances does not establish the arrest-like restraint required for *Miranda* warnings. Mr. Quinlan was questioned in his home, was repeatedly told he was not under arrest and need not answer questions, was not physically restrained while making the statements at issue, and moved within his home without any opposition from officers. A reasonable person in Mr. Quinlan's position would not have understood his freedom of action to have been curtailed to the degree associated with formal arrest. As a result, Mr. Quinlan was not in custody when he made the challenged statements, and the Motion to Suppress Statements (Doc. 30) is DENIED.

DATED at Rutland, in the District of Vermont, this 13th day of February 2026.

Mary Kay Lanthier
United States District Judge